UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWIN T. TANTOH,<br><br>Defendant. | Criminal Action No.  08-213 (JDB) |

**MEMORANDUM OPINION & ORDER**

Before the Court is [71] defendant Edwin Tantoh's motion to suppress statements made by Tantoh on July 22, 2008.  Tantoh and five co-defendants had been indicted on bank fraud and related offenses on July 17, 2008.  On July 22, 2008, Tantoh was arrested at his home pursuant to an arrest warrant.  Transcript of May 14, 2009 Hearing ("Tr.") at 11:25-12:3.  The arrest took place early in the morning -- between 6:00 and 7:00 a.m. -- and was carried out by between six and eight armed agents.  Id. at 12:15-17, 33:23-34:1.  Tantoh was immediately handcuffed, id. at 35:20-25, and consented to a search of his apartment and computer, id. at 13:23-14:10.  The search did not reveal any evidence of criminal activity.  See id. at 32:11-33:5.

While the search was taking place, Tantoh remained handcuffed in his home for approximately one-and-a-half to two hours.  Id. at 24:13-14.  During that time, Special Agent Ryan Petrasek had a conversation with Tantoh in which Petrasek explained that the charges against Tantoh carried a sentence of up to 30 years incarceration.  Id. at 24:24-25:8, 26:11-15. Petrasek also explained that Tantoh would potentially be deported if convicted because Tantoh is not a U.S. citizen.  Id. at 26:11-17.  Petrasek advised Tantoh that the investigation would also

examine whether the mother of Tantoh's child was involved with the alleged bank fraud conspiracy because she was believed to have cashed a forged check.  Id. at 27:21-28:3.  Petrasek told Tantoh that he was seeking Tantoh's cooperation because he "did not believe that [Tantoh] was the mastermind behind the conspiracy."  Id. at 36:23-37:5.  But Petrasek did not ask Tantoh any questions at the apartment.  Id. at 28:25-29:3.  Indeed, each time Tantoh began to speak about the case, Petrasek stopped him and told him to wait until they were in a more controlled environment.  Id. at 28:4-11.

Once the searches were concluded, Petrasek and two other agents transported Tantoh to a Secret Service field office in downtown Washington, D.C.  Id. at 34:21-35:1.  Tantoh was taken into an interview room and was offered food, drink, and an opportunity to use the restroom.  Id. at 35:7-13.  He remained handcuffed.  Id. at 15:23-16:5.  Petrasek then asked Tantoh if he was still willing to speak about the case, and when Tantoh responded affirmatively, Petrasek read Tantoh his rights under Miranda v. Arizona, 384 U.S. 436 (1966), using Secret Service Standard Form 47.  Id. at 16:17-17:1.  Petrasek gave the form to Tantoh, let him read it, and then Tantoh signed and dated it, thereby acknowledging that he was aware of his rights.  Id. at 16:23-17:1, 17:23-18:7.  Petrasek initiated an interview, during which Tantoh made the statements that are the subject of the present motion.  The interview lasted between 45 minutes and one hour.  Id. at 18:14-16.  At the conclusion of the interview, Petrasek asked Tantoh to memorialize the interview with a written statement, and Tantoh stated that he did not wish to make a written statement without his attorney present.  Id. at 19:15-23.  At that point, the interview ceased.  Id. at 19:24-25.

## ANALYSIS

Tantoh argues that the statements he made at the Secret Service field office must be suppressed because they were not voluntary. Although Tantoh waived his Miranda rights before giving the statements, Petrasek had obtained Tantoh's agreement to speak with the government about the case several hours before he was made aware of those rights. Moreover, the argument goes, Petrasek had obtained Tantoh's agreement to make a statement by making Tantoh aware of the potential consequences of a conviction.

Under Miranda, statements "stemming from custodial interrogation of the defendant" may not be used by the government unless the defendant is made aware of his rights against compulsory self-incrimination before making the statements. Miranda, 384 U.S. at 444. Here, there is no dispute that Tantoh was in custody from the moment he was arrested at his home. The only question, rather, is whether Petrasek's conversation with Tantoh at Tantoh's home constitutes "interrogation." The definition of "interrogation" for purposes of the Miranda analysis was set forth by the Supreme Court in Rhode Island v. Innis, 446 U.S. 291, 301 (1980): "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Petrasek's one-sided conversation at Tantoh's home does not constitute "interrogation" under this definition. Petrasek was careful to avoid questioning Tantoh. See Tr. at 28:25-29:3. Nor were Petrasek's words or actions reasonably likely to elicit an incriminating response. Indeed, each time Tantoh attempted to discuss the case, Petrasek interrupted him and told him to wait until later to speak. Id. at 28:4-11. Hence, it cannot be said that Petrasek's

conversation with Tantoh at Tantoh's home constitutes "custodial interrogation."

Tantoh nevertheless argues that the statements must be suppressed because they were not made voluntarily. Tantoh's precise argument is unclear; he appears to argue that the statements were not made voluntarily and cites to cases like Lynumn v. Illinois, 372 U.S. 528 (1963). See Tantoh's Mem. in Aid of Mot. at 3-4. But Lynumn involved an interrogation where the defendant was never advised of her rights. Here, however, Tantoh made the statements at issue after being advised of his rights pursuant to Miranda. Knowing that he had the right to remain silent, the more relevant question is whether Tantoh's waiver of that right was voluntary.

A waiver is valid if it was made "voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)). Tantoh's comprehension of his rights has not been challenged. He has not averred that he was under the influence of alcohol or narcotics or that he suffered from any other condition that impinged on his ability to understand his rights. Indeed, Tantoh had some previous experience with the U.S. criminal justice system, see Tr. at 20:1-3, which supports a conclusion that he had some awareness of his rights, see Mitchell v. United States, 434 F.2d 483, 487-88 (D.C. Cir. 1970).

Instead, Tantoh argues that he was coerced into waiving his rights. By the time Tantoh was given his Miranda rights, the argument goes, he had already been persuaded to cooperate with Petrasek and hence felt obliged to provide a statement. But this argument is unpersuasive. "Truthful statements about [a defendant's] predicament are not the type of 'coercion' that

threatens to render a statement involuntary." United States v. Pelton, 835 F.2d 1067, 1073 (4th Cir. 1987).  Here, Petrasek's pre-Miranda statements to Tantoh about the potential consequences of conviction were entirely truthful.  And "[g]eneral encouragement to cooperate is far different from specific promises of leniency."  Id.  Here, although Petrasek did encourage Tantoh to cooperate with the investigation, he did not make any specific promises about leniency.  Hence, Petrasek's pre-Miranda conversation, in which he established that Tantoh wanted to make a statement, was not unconstitutionally coercive and therefore does not render the later post-Miranda statement involuntary.

Moreover, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver."  North Carolina v. Butler, 441 U.S. 369, 373 (1979); see also United States v. Yunis, 859 F.2d 953, 961 (D.C. Cir. 1988) ("The administration of proper Miranda warnings, followed by a written waiver of the rights described in those warnings, will usually go far toward demonstrating that a decision to speak is not compelled.").  Here, before Tantoh made the statements at issue, he was advised of his Miranda rights and executed a written waiver.  This further underscores the conclusion that Tantoh's waiver was not involuntary.

Accordingly, it is hereby **ORDERED** that Tantoh's motion to suppress is **DENIED**.

/s/
JOHN D. BATES
United States District Judge

Date: June 30, 2009